UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Kimberly Sykes, Tevya Grace Urquhart,

  Plaintiffs,

v.

Derrick Anderson, Carol Nichols and
Maurice McClure, Jointly and Severally and
in their Individual Capacities and City of
Detroit,

  Defendants.
               /

Case Nos. 05-71199, 05-73725

Honorable Nancy G. Edmunds

**OPINION EXPLAINING THE COURT'S DENIAL OF DEFENDANTS' REQUESTS FOR REMITTITUR**

On February 25, 2008, a jury found that Defendants Derrick Anderson and Carolyn Nichols violated Plaintiffs' constitutional rights. The jury awarded Plaintiff Urquhart $1,020,000.00 in compensatory damages and $250,000.00 in punitive damages on her malicious prosecution claim against Anderson and Nichols and on her due process claim against Anderson. (Dkt. 170.) The jury awarded Plaintiff Sykes $1,063,000.00 in compensatory damages and $250,000.00 in punitive damages on her unlawful seizure and due process claims against Anderson and her malicious prosecution claim against Anderson and Nichols.[1] (Dkt. 171.) Defendants appealed. On November 9, 2010, the Sixth Circuit affirmed the Defendants' liability and remanded the matter so that the Court

---

[1] Defendants Anderson and Nichols are jointly and severally liable for the compensatory damages, whereas Nichols is liable for $100,000.00 of the punitive damages and Anderson is liable for $150,000.00 to each plaintiff.

could provide an explanation for its denial of Defendants' motions for remittitur. The Sixth Circuit limited the scope on remand solely to the Court's explanation of its denial and for "some justification as to why the jury's award fell within the permissible range." *Sykes v. Anderson*, 625 F.3d 294, 322-23, n. 17 (6th Cir. 2010); Dkt. 309.

In this explanation, the Court views a complete recitation of the facts unnecessary and will only focus on the facts it found relevant in its denial of Defendants' motions for remittitur.

## I. Denial of Remittitur

The Court denied Defendants' motions for remittitur because testimony supported both the compensatory and punitive damages awards. Plaintiffs presented testimony that could have supported a portion of Plaintiffs' compensatory awards based upon economic damages. That testimony would have supported a significant portion of the compensatory damages awards. Plaintiffs also presented testimony that could have supported the jury's compensatory damages award based upon noneconomic damages. Regarding punitive damages, the Court found the jury's award fell within a permissible range and that the ratio of compensatory to punitive damages was not excessive. From testimony at trial and the actions Defendants took that led to Plaintiffs' false arrests and incarcerations, the jury could have reasonably determined that Defendants acted egregiously enough to award the amount that it did.

### A. Testimony Supported the Jury's Compensatory Damages Award

As the Sixth Circuit stated, this Court has the discretion to remit a compensatory damages verdict when, "reviewing all the evidence in the light most favorable to the prevailing party, [the Court] is convinced that the verdict is clearly excessive; resulted

2

from passion, bias, or prejudice, or is so excessive or inadequate as to shock the conscience of the court." *Sykes*, 625 F.3d at 322 (citation omitted). If the Court finds that there is credible evidence to support the jury's award, the Court should not set aside the award. *Id.*

Here, the Court found credible evidence to support a compensatory damages award. The Court instructed the jury that it could award damages for the following compensatory damages: lost wages, loss of income, legal representation at the criminal trial and appeal, embarrassment or humiliation, shame, aggravation or outrage, indignation, fright and shock, mental distress and mental anguish, reasonable expenses of necessary medical care, and pain and suffering. The Court instructed the jury that it could also award damages for amounts that the jury thought Plaintiffs were reasonably certain to sustain in the future, including: pain and suffering, reasonable expenses of necessary medical care, treatment and services, mental distress and mental anguish, fright and shock, indignation, aggravation or outrage, shame, embarrassment or humiliation, loss of income, and lost wages. (Dkt. 265, Trial Tr. vol. 11, 38-39, Feb. 21, 2008.) Although the jury did not separate its compensatory damages award into economic and noneconomic damages, the Court instructed the jury that it could award both categories of damages and the Court finds the separation useful in its explanation of why it denied Defendants' motions for remittitur.

1. **Credible Evidence of Economic Damages Supported at Least a Portion of the Compensatory Damages Awards**

    a. **Urquhart's Economic Damages**

As to Urquhart's economic damages, the Court found that the evidence presented of loss of income, wage loss, and future loss of income and wage loss could almost account for all of the jury's award to her.

Urquhart testified that she earned around $42,000.00 per year right before the criminal trial. (Dkt. 257, Trial Tr. vol. 3, 7, Feb. 7, 2008.) This number is a conservative one, as it does not include overtime or exact commissions. For the two years she was going through her criminal trial, she was unable to find work. The jury could have reasonably found that Urquhart was at least entitled to two times that amount-- $84,000.00. When she did find work, she earned $8.00 per hour. (*Id.* at 133.) She also testified that from September, 2005, she was earning $7.25 per hour at a different part-time job. (*Id.* at 136.) And from August, 2006 to August, 2007, she worked an additional part-time job, earning $10.16 per hour. (*Id.*) She stated that she did not receive benefits from either place. (*Id.*) Even assuming that she worked 40 hours for 52 weeks, her income, earning $7.25 per hour, would only be $15,080.00, roughly $26,920.00 less than the $42,000.00 she was earning at the time right before her criminal trial.

As the Court instructed the jury that it could compensate Plaintiffs for both past, present, and future damages, the jury could have reasonably multiplied the $26,920.00 by the number of years Urquhart had until the age of her retirement, at the time of trial, 31 years. (Dkt. 243, Trial Tr. vol. 11, 39, Feb. 21, 2008.) That number would give future lost earnings of $834,520.00. That amount, plus the $84,000.00, equals $918,520.00 and already puts the compensatory damages award within the reach of the jury's actual award. This conservative amount does not include a benefits calculation, which

Urquhart stated at trial that she was receiving at Sprint, but not at her later jobs. The Court found that in the light most favorable to Urquhart, the award fell within a permissible range.

### b. Sykes's Economic Damages

As to Sykes's economic damages of loss of income, wage loss, and future loss of income and wage loss, a conservative calculation reaches almost half of her compensatory award. She stated that she earned more than $28,500.00 per year, plus benefits, working at Sprint before the criminal proceedings and trial. (Dkt. 241, Trial Tr. vol. 9, 60, Feb. 19, 2008.) Sykes presented testimony that she was unable to find work for the roughly four years between her arrest and trial. (*Id.* at 25-26.) Based off of her 2001 Sprint salary, four years' loss of income would be $114,000.00. In 2006, when Sykes found work, she earned $6.00 per hour and then $9.00 per hour two years later. She did not earn benefits at this job. (*Id.* at 57-58.) Assuming this $9.00 amount from 2006 to 2008, Sykes was still making at least $9,780.00 less per year than at Sprint, for a total of $19,560.00 less than she would have earned at Sprint during those years. From 2002 until 2008 then, the Court finds that the jury could have conservatively awarded $133,560.00 based on lost wages.

As to future lost income and earnings, Sykes presented testimony that could have justified an award. During the trial, Sykes was 30; assuming she worked until 65 and had a static income, the jury could have awarded future lost wages: 35 multiplied by the conservative $9,780.00, which would equal $342,300.00.

That amount, added to the lost wages and income through trial, would bring the award around $475,860.00, again within reach of the jury's actual award.

5

Sykes also testified that she expended around $20,000.00 in attorneys' fees and costs for her criminal trial and appeal. (*Id.* at 48.) Those fees would bring Sykes's economic estimate of compensatory damages to the conservative total of $495,860.00. And again, this amount is a conservative figure, for the calculation does not include a benefits amount which Sykes testified she no longer received. The Court found that this amount justified a good portion of her compensatory damages award.

### 2. Credible Evidence of Noneconomic Damages Supported the Remaining Portion of the Compensatory Damages Awards

As to any portion of the compensatory damages that the jury awarded based on noneconomic damages, Plaintiffs presented testimony that justified the jury's award of damages and the Court's denial of Defendants' motions for remittitur.

#### a. Urquhart's Noneconomic Damages

The Court took into account Urquhart's testimony, as well as her father's testimony and the testimony of a treating physician, to uphold any portion of the jury's compensatory damages award based on noneconomic damages. Urquhart testified at length regarding how horrible she felt and the horrors she experienced in jail and afterwards. Urquhart testified that she was hysterical when she first learned that Sykes had been arrested and that she needed to report to the police station. (Dkt. 257, Trial Tr. vol. 3, 78-79, Feb. 7, 2008.) She testified that she spent her first night in jail when she turned herself in. (*Id.* at 80.) She stated that after she was released from jail after her arrest, she was welcomed home by a termination letter from Sprint. (*Id.* at 124.)

Urquhart also testified about her separation from her child while she was in jail for her criminal conviction. She stated that she sat in jail, without her son, for over two months. (*Id.* at 106.) Urquhart told the jury how isolated she was during her forty-three days in jail. (*Id.* at 140.)

The Court found that the jury could have reasonably awarded an amount to compensate Urquhart for her experiences before and during jail.

Urquhart's father also testified. He told the jury that the false accusation, conviction, and incarceration affected his daughter's life and led to her depression. (Dkt. 264, Trial Tr. vol. 9, 28, Feb. 19, 2008.) He stated that she was different after the incident. (*Id.*) He also told the jury how she was concerned about her job prospects, that she worried about handling large amounts of money and being responsible for keys to her workplace. (*Id.*)

Urquhart also presented Dr. Rosalind Griffin's testimony that supported a portion of the jury's compensatory damages award. Dr. Griffin testified that she met with Urquhart for more than eight hours and assessed her health and the effects the criminal trial and incarceration had on her. (Dkt. 242, Trial Tr. vol. 10, 87, Feb. 20, 2008.) Dr. Griffin testified to the following information that would support a noneconomic damages portion of the compensatory award:

- Urquhart wanted to return to work. (*Id.* at 58.)
- Urquhart suffered from post traumatic stress disorder that was directly related to the robbery, false accusation and prosecution, conviction, and incarceration. (*Id.* at 88-89.)

7

- Urquhart suffered stress from going to prison and being separated from her child. (*Id.* at 89.)
- Urquhart had financial stress and worry about finding safety for her child and herself. (*Id.* at 89.)
- 90% of the noneconomic compensatory damages award would be related to the false accusation, conviction, and incarceration. (*Id.* at 97-98.)
- Urquhart would benefit from counseling, but she could not afford it since she lost her job; but even if she had treatment, she would still have difficultly performing at a job. (*Id.* at 97-99.)

The Court therefore found that Urquhart presented enough credible evidence on which the jury could base a noneconomic compensatory damages award.

### b. Sykes's Noneconomic Damages

Sykes presented credible evidence that the Court found could support a noneconomic damages award. As Urquhart did, Sykes presented Dr. Griffin's testimony to show her mental and emotional state during and after the incidents that led to her claims against Defendants. Sykes and her minister also testified to her mental and emotional state during and after her arrest, criminal trial, and incarceration.

Sykes told the jury what happened and how she felt the day Anderson arrested her. She stated how she felt embarrassed, afraid, and was in disbelief that people were at her door with handcuffs, ready to arrest her. (Dkt. 241, Trial Tr. vol. 9, 34, Feb. 19, 2008.) Sykes related Anderson's interrogation and how he said she was "no F'n good," that she was a thief, a liar, and a cheat. (*Id.* at 37.) This interrogation made her feel degraded. (*Id.*) After the interrogation, she stated that she had to spend the night in jail. (*Id.*) After her

8

criminal trial, Sykes testified that she went into jail, was strip searched, and that she felt terrified and fearful. (*Id.* at 42-43.) She also told the jury how she lost weight while spending her fifty-eight days in jail. (*Id.* at 44, 47.)

Reverend Dolores Emanuel testified on Sykes's behalf. Rev. Emanuel, Sykes's pastor, testified that she spoke with Sykes everyday while she was in jail. (Dkt. 264, Trial Tr. vol. 9, 29-20, Feb. 19, 2008.) Rev. Emanuel testified that Sykes called her, crying, and feeling despondent and helpless. (*Id.* at 33.) Rev. Emanuel also told the jury how she knew Sykes since she was six and she was not the same person after the trial, conviction, and jail, as she was before. (*Id.* at 36.)

Sykes also presented Dr. Griffin. Dr. Griffin testified that:

- Sykes wanted to return to work. (Dkt. 242, Trial Tr. vol. 10, 58, Feb. 20, 2008.)
- Sykes was emotionally injured from the false accusation, conviction, and incarceration. (*Id.* at 63.)
- Sykes suffered from a major depression disorder and post traumatic stress disorder that affected her thought processes, concentration, sleep, and led to crying and mood spells. (*Id.* at 63-65.)
- Sykes would require and could benefit from treatment. (*Id.*)
- Sykes had paranoia and depressive personality traits due to her concerns about being viewed as a criminal and whether the robbery would show up on a background check when she would apply for a job. (*Id.* at 64.)
- Sykes felt tainted and socially isolated from her friends due to the incident. (*Id.*)
- Sykes was afraid because the interrogators told her that she would get married or have children. (*Id.* at 65.)

9

- Sykes felt alone, hopeless, isolated, and feared for her life when she was incarcerated. (*Id.* at 66.)
- Sykes had to put tissue paper in her ears because she felt that roaches were going to crawl in them while she was in jail. (*Id.*)
- Sykes's ailments had a direct connection between being falsely accused of a crime, tried, convicted and incarcerated, and her post traumatic stress disorder. (*Id.* at 70.)
- Sykes had been victimized as much by the police as by the Sprint store robbers. (*Id.* at 74-75.)
- Sykes had her reputation tainted or destroyed. (*Id.* at 78-79.)
- Sykes was a good candidate for help through continued counseling and treatment, but was unable to afford it because she could not secure employment. (*Id.* at 85.)

Dr. Griffin, in sum, stated that Defendants' treatment of Sykes had irreparably damaged her state of mind, work habits, and her job prospects. (*Id.* at 83.) From Sykes, her minister, and Dr. Griffin, the Court found that testimony supported an award based upon Sykes's experiences during jail and afterward.

### B. Testimony Supported the Jury's Punitive Damages Award

Regarding remittitur of the punitive damages award, the Sixth Circuit has instructed the Court to consider: how reprehensible Defendants' conduct was; the disparity between the harm suffered by Plaintiffs and the punitive damages award; and the differences between the punitive damages and the civil penalty imposed in comparable cases. *Sykes*, 625 F.3d at 322 (quotation marks and citations omitted).

The Sixth Circuit, in its opinion, stated that Defendants waived the argument that their conduct was not reprehensible. The Court therefore briefly discusses the conclusions that supported the award to show how Defendants' conduct was reprehensible enough to support punitive damages awards of $150,000.00 against Anderson and $100,000.00 against Nichols to both Urquhart and Sykes.

The Court instructed that the jury could award Plaintiffs punitive damages if the jury thought that Defendants' actions constituted extraordinary misconduct and if the jury found Defendants acted recklessly or callously indifferent to Plaintiffs' constitutional rights. (Dkt. 265, Trial Tr. vol. 11, 40, Feb. 21, 2008.)

The Court found that the punitive damages awards were not excessive in light of Defendants' conduct and the ratio of the compensatory damages to punitive damages. Here, in awarding punitive damages, the jury expressed that it found Defendants to have acted recklessly or callously indifferent to Plaintiffs' constitutional rights. As the Sixth Circuit itself noted, there was ample evidence presented for the jury to determine that Defendants' actions warranted punitive damages. By returning a verdict against Anderson for the false arrest claim and awarding punitive damages, the jury found that enough evidence existed to show that Anderson manufactured probable cause by making false or misleading statements and omitting material information from his warrant application. By returning a verdict against Anderson and Nichols for malicious prosecution, the jury found that Defendants' actions either influenced or participated in the decision to prosecute Plaintiffs, even though there was no probable cause as to either plaintiff. And on the due process claim against Anderson, the jury also found that sufficient evidence existed to find against him. The Court was satisfied with both the verdict as well as the punitive damages

award that could be awarded based upon Anderson's affirmative concealment during the trial that led to this claim.

The Court did not remit the punitive damages because it recognized that the jury found Defendants' conduct, that directly led to Plaintiffs lengthy incarcerations despite a lack of evidence against Plaintiffs, warranted punitive damages.

Regarding the ratio of compensatory damages to punitive damages, four to one, the Court did not find that that ratio was excessive in light of the direct link between Defendants' actions and Plaintiffs' false arrests, convictions, and incarcerations. The jury could have reasonably viewed Defendants' conduct so reprehensible to award the moderate punitive damages that it did.

The third factor did not play a role in this case.

The jury therefore found evidence that Defendants' actions led to Plaintiffs' claims and necessitated punitive damages. The Court agreed that Plaintiffs presented this evidence of the reprehensibility of Defendants' acts that warranted punitive damages and found that the ratio of compensatory damages to punitive damages was not excessive.

## II. Conclusion

For the reasons stated above, the Court denied Defendants' motions for remittitur.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: December 20, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 20, 2010, by electronic and/or ordinary mail.

s/Carol A. Hemeyer

Case Manager